# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| VICTORIA BALLARD, ) | |
| ) | |
| Plaintiff, ) | Case No. 18-cv-2944 |
| ) | |
| v. ) | Judge Robert M. Dow, Jr. |
| ) | |
| JEWEL FOOD STORES, INC., ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

In her governing complaint [1], Plaintiff Victoria Ballard ("Plaintiff") asserts a claim against her former employer Jewel Food Stores, Inc. ("Defendant" or "Jewel") for violation of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.* This matter is before the Court on Defendant's motion for summary judgment [33]. For the following reasons, Defendant's motion for summary judgment [33] is denied. This case is set for status hearing on February 20, 2020 at 9:00 a.m.

**I.      Background**

The following facts are taken from the parties' Local Rule 56.1 statements and accompanying exhibits. See [35], [36-1], [38], [41]. These facts are undisputed except where a dispute is noted. This case involves application of the FMLA. The Court has jurisdiction over this action pursuant to 29 U.S.C. § 2617 and 28 U.S.C. § 1391.

Plaintiff was hired by Defendant as a part-time clerk/cashier in 2008. She worked at the Jewel store located at 1128 Chicago Avenue in Evanston, Illinois (the "Store"). Until her ultimate termination, Plaintiff was a member of a bargaining unit represented by the United Food and Commercial Workers International Union, Local 881 (the "Union"). Plaintiff previously worked

at Jewel in July 2000, when Jewel was owned by Supervalu. There is a factual dispute concerning why Plaintiff left Jewel at that time, which is not material to the present action.

At the time period relevant to this action, the Store's Manager was Bill Peters ("Peters"). Plaintiff's immediate supervisor was Front End Manager Brad Manzo ("Manzo"). Terry O'Donnell ("O'Donnell") served as the Store's interim manager at the time of Plaintiff's termination.

When Plaintiff began her employment with Defendant in 2008, she received Jewel's employee handbook ("Handbook"), which contains Defendant's policy on attendance and tardiness. Plaintiff also received a revised Handbook in 2016. [41-3] at 6. At her deposition, Plaintiff testified that she understood that she needed to follow the policies contained in the Handbook. *Id*. at 6-7. She also acknowledged that she had "an obligation to know what the policies are and to comply with them." *Id*. at 36. Plaintiff disputes Defendant's assertions that she was aware of Defendant's policy on attendance and tardiness and that she reviewed the Handbook.

During the time relevant to this action, the Handbook stated: "Repeated absences and tardiness affect our customer service. They also burden your co-workers. Therefore, excessive tardiness or absenteeism will subject you to discipline, up to and including termination." [36-1] at 2. The Handbook further stated that "excessive tardiness, absenteeism or other forms of unreliability" will result in disciplinary action, up to and including termination. *Id*. Jewel also maintained specific progressive discipline policies addressing absenteeism and tardiness. See [38] at 3. Pursuant to the absence policy, ten or more "accountable" absences within a rolling 12-month period would result in termination. [35-3] at 167. Leaves requested and approved under the FMLA did not count as "accountable" absences. *Id*. Pursuant to the tardiness policy, nine or more instances of tardiness during a rolling 12-month period would result in termination. [36-1] at 2-3.

Several times during her employment by Defendant, Plaintiff was counseled concerning the importance of regular attendance. Specifically, in 2009, Plaintiff's supervisor noted that she was not meeting Defendant's expectations for attendance and punctuality. In her 2010 review, Plaintiff's supervisor informed Plaintiff that her tardiness and absenteeism were excessive and required improvement. Plaintiff's 2011 evaluation also indicated that Plaintiff needed improvement in the areas of tardiness and absenteeism. However, as Plaintiff points out, no discipline was imposed following any of these reviews and Plaintiff's "overall performance" evaluation was that she met Defendant's expectations. Also, in her 2009 and 2010 reviews Plaintiff received an overall rating of 3 out of 5, indicating that she "met all expectations that Jewel requested of her." [38] at 2. In her 2011 review, Plaintiff received a rating of "consistently meets and often exceeds expectations in regard to customer service." *Id*.

The Handbook contains a policy concerning FMLA leave. The "Employee Responsibilities" section of the Handbook sets out the following steps that employees were required to follow to request FMLA leave: "Employees must provide 30 days advance notice of the need to take FMLA leave when the need is foreseeable. When 30-day notice is not possible, the Employee must provide notice as soon as practicable and generally must comply with the Company's normal call-in procedures. Employees must provide sufficient information for the Company to determine if the leave may qualify for FMLA protection and the anticipated timing and duration of the leave. … Employees also must inform the employer if the requested leave is for a reason for which FMLA leave was previously taken or certified. Employees also may be required to provide a certification and periodic certification supporting the need for leave." [36-1] at 3.

Pursuant to Defendant's FMLA policy, an employee seeking FMLA leave must inform Defendant's human resources department ("HR") of a potential need for FMLA leave by submitting FMLA paperwork. Myra Cook ("Cook"), the Personnel Coordinator at the Store, had copies of the FMLA paperwork and also assisted employees if they needed help applying for FMLA leave. Cook did not have any role in determining FMLA eligibility. It was Defendant's policy and Cook's regular practice to always provide the FMLA paperwork and advise the employee to request FMLA leave.

Plaintiff requested FMLA leave in February 2014 and was granted FMLA leave in March 2015. Those requests did not concern diabetes. Plaintiff knew that she could go to Cook if she had questions about how to submit FMLA paperwork. Plaintiff also testified that based on her experience of requesting leave in 2014, she was familiar with the procedures to request FMLA leave. See [35-3] at 12. However, Plaintiff testified that she was not aware that the Handbook had a policy concerning FMLA leave. See *id*. at 10.

According to Plaintiff, she found out in August 2015 that she had diabetes. [35-3] at 23. Plaintiff testified that she told Manzo right away. *Id*. Plaintiff also testified that "[e]verybody in the store knew I had diabetes and I was really sick." *Id*.

Around the same time, Plaintiff began receiving progressive discipline, which culminated in her termination. Specifically, on August 14, 2015, Defendant issued an Associate Corrective Action Review ("ACAR"), which gave Plaintiff a verbal warning for being tardy on July 13, July 15, July 19, August 1, August 3, and August 12, 2015. Plaintiff signed the ACAR and admitted at her deposition that she read the document and understood its contents and that her tardiness was not related to or protected by the FMLA. Nonetheless, Plaintiff testified that "I don't recall this because I can't see myself being absent for five days in a row." [35-3] at 14.

On August 31, 2015, Plaintiff was issued an ACAR for "excessive absences" related to "absences" (not tardiness) on the following dates: July 13, July 15, July 19, August 1, August 3, and August 12, and August 29, 2015. [35-3] at 169; see also [38] at 3. Plaintiff signed the ACAR and admitted at her deposition that she read the document and understood its contents and that her August 29 absence was not related to or protected by the FMLA. Plaintiff denies, however, that Manzo verbally told her that further absences would lead to a suspension. See *id*. at 5.

Plaintiff was also issued an ACAR for being absent on September 11, 12, and 13, 2015. See [35-3] at 170. In her Local Rule 56.1 response, Plaintiff denies that she was absent on those dates, but the deposition testimony on which Plaintiff relies says only that Plaintiff did not remember or recall being absent on those dates. See [35-3] at 15-16. The ACAR for these dates states that Plaintiff was being given a one-day suspension. [35-3] at 170. Plaintiff attended a meeting with Manzo about the ACAR and signed the ACAR on September 15, 2015. *Id*.; see also [35-3] at 15-16. The ACAR does not have a signature line for Manzo. See [38] at 5-6. Plaintiff recalled that Manzo told her that if she had any issues with the disciplinary action, she should file a grievance with her Union representative; however, Plaintiff never filed a grievance. Plaintiff admitted at her deposition that she did not request FMLA paperwork or leave for September 11, 12, or 13, 2015.

On October 21, 2015, Plaintiff received and signed an ACAR documenting her absences on October 18 and 19, 2015. During the corrective action meeting with Manzo, Plaintiff did not contest the discipline or indicate that her absences were FMLA-related. See [35-3] at 17. At her deposition, Plaintiff recalled Manzo telling her that additional absences would lead to more discipline. *Id*. The ACAR shows that Plaintiff would be receiving a 3-day suspension, see [35-3] at 171; however, Plaintiff testified at her deposition that she was not or did not recall being

suspended for three days, but instead recalled serving one-day and five-day suspensions in 2016. See *id.* at 17. According to Defendant, Plaintiff was issued the 3-day suspension under Defendant's progressive discipline policy because "this was the eighth incident during the rolling 12-month period." [36-1] at 5.

Plaintiff was again absent on December 29, 2015, which she admits was "her ninth incident during the rolling 12-month period." [36-1] at 5. On January 1, 2016, Plaintiff received a 5-day suspension for this absence. During the corrective action meeting, Plaintiff indicated that her absence was because her daughter had to have surgery. She did not, however, request FMLA for that absence and never submitted any FMLA paperwork for the absence. The ACAR given to her during the meeting warned that "[f]urther occurrence will lead to further disciplinary action up to and including termination." [36-1] at 5. Plaintiff admits that she read the ACAR and understood its contents prior to signing the document.

There is a dispute concerning whether Plaintiff attended work on April 26, 2016. Plaintiff testified that she worked that day and closed the store. However, Defendant's business records show she did not work that day. See [38] at 6.

Plaintiff was absent from work on April 27, 2016. According to Plaintiff's deposition testimony, she called in sick that day and spoke to Manzo, who told her "[y]ou need to go ahead and do the FMLA before you get fired. I don't want you to get fired because you['re] a good worker." [35-3] at 9.

According to an affidavit provided by Manzo, on the same day (April 27, 2016), he faxed Plaintiff's attendance history to HR to receive guidance on whether Plaintiff should be terminated. According to Manzo, HR confirmed that termination was warranted. Plaintiff disputes this on the basis that Manzo's credibility is at issue and "[t]here is no documentation to support Manzo's

uncorroborated affidavit that Jewel's Human Resource Department confirmed that Ballard's termination was warranted." [36-1] at 6. The record does not show HR's response, but it does include an "HR/AR CALL-IN SHEET" indicating that on April 27, 2016, Manzo filled out a report showing that Plaintiff had 10 incidents of accountable absences within a 12-month rolling period. [35-3] at 176-77. Defendant admits that Manzo did not receive written authorization to terminate Plaintiff. See [38] at 10.

According to Plaintiff's deposition testimony, she came into work on April 28, 2016, but was still not feeling well. Plaintiff testified that she told Manzo that she still was not feeling well but was willing to work, but Manzo told her "he didn't want [her] to work like that." [35-3] at 9.

Plaintiff further testified that she came to work on April 29, 2016, at which time Cook "gave me the FMLA papers and told me to take them to my doctor and have him fill [them] out as soon as possible and bring them back." [35-3] at 9. According to Plaintiff, she took the papers to her locker and then punched in for work.

About 15 minutes later, Plaintiff testified, she was called "upstairs" to speak with Manzo and O'Donnell. [35-3] at 9. Plaintiff received an ACAR listing absences on April 26 and April 27, 2016. According to Defendant, Plaintiff's absences on April 26 and April 27, 2016 "resulted in ten (10) instances during the 12-month rolling period," which "subjected her to potential termination under Jewel's absenteeism and tardiness policies." [36-1] at 5. O'Donnell signed the ACAR, but Plaintiff refused to sign. See [35-3] at 174. In her deposition, Plaintiff testified that she had worked on April 26, 2016, contrary to the ACAR. See [35-3] at 21.

According to Plaintiff, the following occurred after she was summoned upstairs: "Terry asked me to close the door. So I closed [the] door. He said we're terminating you due to your absences, due to your medical condition. And I was a risk, a health risk at the store, and they was

7

losing money because I need to be on time and I need to be at work when I'm scheduled." [35-3] at 9. Plaintiff testified that she told Terry that she "just got the FMLA form from Ms. Cook, and they was in my locker," but Terry told her that "it was too late." *Id*. When Plaintiff asked how she could get her job back, Terry told her to call her union representative. *Id*. Plaintiff testified that the union representative was "basically no help at all," *id*., but also admitted that she never filed a grievance with the Union, *id*. at 36. Plaintiff admits that she was given the opportunity to contest the termination but did not. *Id*. at 39. Plaintiff never completed or submitted the FMLA paperwork that Cook had handed her. *Id*. at 22; see also *id*. at 39.

## II. Legal Standard

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by *** citing to particular parts of materials in the record" or "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The Court "must construe all facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Majors v. Gen. Elec. Co.*, 714 F.3d 527, 532-33 (7th Cir. 2013) (citation omitted).

To avoid summary judgment, the nonmoving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby*, 477 U.S. at 250.

Summary judgment is proper if the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Ellis v. CCA of Tennessee LLC,* 650 F.3d 640, 646 (7th Cir. 2011) (quoting *Celotex,* 477 U.S. at 322). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Liberty Lobby*, 477 U.S. at 252.

### III. Analysis

In her single-count complaint for FMLA interference, Plaintiff alleges that Defendant violated the FMLA by terminating her immediately after she received paperwork to request FMLA leave. See [1] at 1. The FMLA entitles an eligible employee up to 12 weeks of leave during any 12-month period because of "a serious health condition." 29 U.S.C. 2612(a)(1)(d). Under the FMLA, the employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise, any right provided by the FMLA. 29 U.S.C. 2615(a)(1); see also *Burnett v. LFW, Inc.*, 472 F.3d 471, 477 (7th Cir. 2008). "To prevail on an FMLA-interference claim, an employee must establish the following: (1) she was eligible for the FMLA's protections, (2) her employer was covered by the FMLA, (3) she was entitled to leave under the FMLA, (4) she provided sufficient notice of her intent to take leave, and (5) her employer denied her FMLA benefits to which she was entitled." *Valdivia v. Township High School District 214*, 942 F.3d 395, 398 (7th Cir. 2019) (citing *Burnett*, 472 F.3d at 477).

Defendant argues that it is entitled to summary judgment on Plaintiff's FMLA interference claim because "the undisputed evidence confirms that [Plaintiff] did not provide notice of her

9

intent to take leave, and Jewel did not deny her any FMLA benefits to which she was entitled." [34] at 2. Plaintiff argues that the sufficiency of her notice is a question of fact that must be resolved by a jury.

As the Seventh Circuit recently explained, "[t]he FMLA notice requirements 'are not onerous.'" *Valdivia*, 942 F.3d at 399 (quoting *Burnett*, 472 F.3d at 478). "Direct notice from an employee to an employer is not always required; an employer's constructive notice of an employee's need for FMLA leave may be sufficient." *Id*. In other words, "[i]t is enough for purposes of the FMLA *** that an employer 'knows of the employee's need for leave; the employee need not mention the statute or demand its benefits.'" *Id*. (quoting *Stevenson v. Hyre Elec. Co.*, 505 F.3d 720, 726 (7th Cir. 2007)). "Once an employee informs his employer of his probable need for medical leave, the FMLA imposes a duty on the employer to conduct further investigation and inquiry to determine whether the proposed leave in fact qualifies as FMLA leave." *Burnett*, 472 F.3d at 480; see also *Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 220 (7th Cir. 2015).

Applying this standard to the factual record provided by the parties, the Court concludes that the "adequacy of [Plaintiff's] notice of a need for FMLA leave" is "best resolved by the trier of fact." *Valdivia*, 942 F.3d at 400. There is evidence in the record that Plaintiff's supervisor, Manzo, knew that (1) Plaintiff suffered from diabetes, (2) this medical condition was the cause of at least some of Plaintiff's absences, (3) Plaintiff was on the verge of being terminated due to absences, and (4) Plaintiff might be eligible for FMLA leave and in fact told her to apply. Yet, Manzo terminated Plaintiff immediately after she was given the paperwork to apply. Specifically, Plaintiff testified that she told Manzo right away when she was diagnosed with diabetes in August 2015, and that everyone in the Store knew she was very sick. [35-3] at 23. Plaintiff also testified

10

that when she called in sick on April 27, 2016, Manzo told her "[y]ou need to go ahead and do the FMLA before you get fired." *Id*. at 9. When Plaintiff arrived for her shift on April 29, 2016, Cook "gave [Plaintiff] the FMLA papers and told me to take them to my doctor and have him fill [them] out as soon as possible and bring them back." [35-3] at 9. One reasonable inference that could be drawn from this is that Manzo knew Plaintiff needed the paperwork so she could obtain FMLA leave, and directed Cook to provide it. However, fifteen minutes after receiving the paperwork, Plaintiff was called into a meeting with Manzo and O'Donnell and terminated. According to Plaintiff, O'Donnell specifically told her, "we're terminating you due to your absences, due to your medical condition." [35-3] at 9.

Defendant faults Plaintiff for not turning in the FMLA paperwork after the meeting. But Defendant ignores Plaintiff's testimony that O'Connell told her it was "too late." [35-3] at 9. While a reasonable factfinder could certainly conclude that it was unreasonable for Plaintiff to take no further steps to request leave, the Court is hesitant to say that no reasonable factfinder could conclude otherwise—especially in light of *Valdivia*, 942 F.3d at 400. In that case, the Seventh Circuit held that the district court properly left it for a jury to decide whether an assistant to the high school principal provided the school district with sufficient notice of her need for FMLA leave, even though she never directly requested leave. Pointing to evidence that the plaintiff met with the principal on several occasions to report her deteriorating mental health, asked for the accommodation of a ten-month position rather than a twelve-month position, and said that she was incapable of accepting a new work assignment, the court of appeals determined that "[t]hese conversations take the case out of the pure constructive-notice model" and that "[t]he jury was entitled to conclude that this was timely and actual notice to the employer." *Id*.; see also *Ridings v. Riverside Med. Ctr.*, 537 F.3d 755, 762-63 (7th Cir. 2008) (employee with thyroid condition did

11

not fail to invoke her rights under FMLA, so as to preclude her action against employer alleging interference with those rights, by failing to formally request reduced schedule to accommodate her condition; where employee informed employer of her condition, supervisor asked for periodic updates and employee kept supervisor informed, and employer permitted reduced schedule for extended period based on that condition).

Defendant also argues for summary judgment on the basis of evidence that Plaintiff would have been terminated even if she had not requested FMLA leave, because she repeatedly violated Defendant's attendance policy over the twelve months prior to her termination. According to Defendant, the first time Plaintiff "made any mention whatsoever of the FMLA is after she had already exceeded her ten accountable instances of absenteeism or tardiness absences, which subjected her to discharge." [34] at 6.

This issue cannot be resolved on summary judgment. Plaintiff disputes at least one of the absences that Defendant includes in its count, for April 26, 2016. Plaintiff testified that she worked until the Store closed on that date. See [35-3] at 21. More generally, Plaintiff points to evidence in the record supporting her position that absences and tardiness are treated separately under Defendant's policies and that Defendant erroneously grouped the two types of disciplinary actions to reach a high enough number to justify her termination. See [36] at 2, 9-10, 13. In particular, Defendant's absence policy provides that ten or more "accountable" absences within a rolling 12-month period will result in termination, while its separate tardiness policy provides that nine or more instances of tardiness during a rolling 12-month period will result in termination. [35-3] at 167; [36-1] at 2-3. Defendant has not come forward with any evidence that tardiness and absences are interchangeable or properly grouped for purposes of determining whether an employee is subject to termination.

Further, the "HR/AR CALL-IN SHEET" that Manzo allegedly sent to HR to confirm that Plaintiff should be terminated suggests that instances of tardiness and absences should be considered separately when tallying up the number of incidents required to terminate an employee. [35-3] at 177. That sheet includes separate sections for "Tardiness" and "Absences" with separate instructions on how to list each incident for purposes of determining the appropriate disciplinary action. *Id*. While the sheet lists all of Plaintiff's disciplinary dates as "absences," the ACAR issued on August 14, 2015 shows that Plaintiff received a verbal warning for being "tardy"—not absent—on July 13, July 15, July 19, August 1, August 3, and August 12, 2015. [35-3] at 14. The next ACAR, dated August 31, 2015, changes those incidents to "absences" without explanation, and adds a new absence for August 29, 2015. [35-3] at 169; see also [38] at 3. When the six "tardies" are considered tardies, Plaintiff had only 6 tardies and 9 absences (at least one of which is disputed) at the time of her termination. In sum, factual disputes concerning whether Plaintiff was absent on April 26, 2016 and whether the July 13, July 15, July 19, August 1, August 3, and August 12, 2015 dates should have been counted as absences make it impossible to say as a matter of law that Plaintiff was properly subject to termination before she ever requested FMLA leave.

## IV. Conclusion

For these reasons, Defendant's motion for summary judgment [33] is denied. This case is set for status hearing on February 20, 2020 at 9:00 a.m.

Dated: February 10, 2020

_____
Robert M. Dow, Jr.
United States District Judge

13